Chief Juptioe Buus
delivered the Opinion of the Court.
, On the 15th December, 1818, I-íczekiali Conn, as the agent of Thomas Buck of Virginia, sold to William BÍ’Caughtry, a tract of land conveyed to Buck by Jonathan Taylor, on the seventh day of Biarch, 1818, as seven hundred and eighty-seven acres, at the price of soten dollars jkt acre, tiie quantity to be ascertained, by actual *217 survey; excepting therefrom fifty acres of that tract, recited in the agreement, to have been decreed to James Latham, by the Union circuit court; and including fifty acres which by the same decree, Latham was to convey to said Taylor; to be also paid for by M’Caughtry, at the same price, the conveyance to be made on' the 15th of April ensuing the date of the agreement, at which time M’Caughtry was to pay one half the purchase, the other half on the 15th October, 1820; the last payment to be secured by a deed of trust on the land. For the conveyance with general warranty, Conn bound himself personally, as well as the said Buck.
McCaughtry’s bill to rescind the conti act.
Allegation of the bill of Conn’s misrepresentations as to the situation of the land, and calling on Conn for his authority to sell, and on Buck to produce his title papers.
M’Caughtry paid about ,$2,700, and on the 18th September, 1821, exhibited liis bill, to rescind the contract; to recover back the money paid, and the value of the imprqvements made on the land by him.
The bill complains, that Conn represented the land as lying “on a certain side of a path shewed by Conn to him, and that it covered certain land on that side of the path, pointed out by said Hezekiah, to your orator, or that it was nearly all on that side.”
That since the sale he has discovered, that Conn, “falsely and fraudulently pointed to him the situation of the land, different from its real location, and is part out side of the line, he. will state that the land lies on both sides of the path stated before, and that it is inferior in value to the land shewed him by said Conn, and which he believed he was really purchasing at the sale aforesaid.”
The bill charges Conn with having so misrepresented the situation of the land, to beguile the complainant into the purchase, well knowing, that upon a fair and correct representation, said Conn would fail to make sale for the price aforesaid.
That Buck and Conn “are unable to convey the land which the said Conn represented to your orator, the said Buck owned, and which he was induced to believe he was purchasing, by the misstatements of the said Conn.”
Conn’s answer.
Buck’s answer.
McCaughtry’s amend ed bill.
By this bill, Conn is asked -to exhibit his authority to sell; Buck is asked to produce his title papers; but no want of authority in Conn, nor any defect of title in Buck is charged. The bill alleges that about $2,700, had been paid, part to Conn, and part to Buck himself.
To this bill, Conn answered at September term, 1821; denying the fraud and misrepresentation; that not knowing the lines and corners, he sent for some of the oldest settlers and residents to assist in shewing the land, by whom the complainant and defendant were attended; that he supposes the path running through the land in-a northwardly direction, from Wm. Thornberry’s, to the plantation on the tract sold, is that alluded to, and avers he shewed the land as lying on both sides of that path, and that they viewed the land on both sides of it, and went to the north-west corner, and to the northeast corner, and from thence as nearly as they could in the direction of the eastwardly boundary to the road that leads from the plantation to Gill’s.
He says that he received part of the money, alleged to have been paid, that about $2,000 thereof, was paid by complainant himself to Buck, in Virginia; who recognized his authority; and that he was authorized by Buck to sell,
At March term, 1822, the answer of Buck was filed, taken upon commission, awarded, and sent to Virginia where he resided. He admits Conn’s authority to sell, and that he has personally ratified the contract. As to the fraud and misrepresentation, he answers that he knows nothing of it, and that he does not believe it.
After the answers of Buck and Conn were'filed, and the title papers exhibited, the complainant filed an amended, bill, by which he charges, that Buck had not the legal title to the land; and has not the legal title at the time of the amended bill; and that Conn had no legal authority to sell; he calls for Buck’s title papers, and for Conn’s authority to sell; and if Buck has not the legal title, or if Conn had no legal authority to sell, he prays the contract may be rescinded.
Answer of Conn and. Buck to the amended bill.
Decree of the circuit court, rescinding tjhe contract.
Statement of the evidence on the allegation of misrepresentation of the situation and boundaries of the land.
To this, Buck and Coun answer, and say that Conn had authority to sell; that Buck’s title is complete, and that they are ready to comply on their part, as soon as complainant complies on his part.
At March term, 1824, the circuit judge decreed that the contract be rescinded; that the defendants refund that portion of the purchase money which had been received, viz: $2,100; and also the sum of $600, for improvements; allowing no deduction for use and occupation; the former sum to be paid in specie, the latter, in paper of the Bank of the Commonwealth, and unless the money was paid by the first of July ensuing, the land was ordered to sale by a commissioner appointed for that purpose; from which the defendants appealed.
As to the misrepresentation chafgéd in the bill, about the situation of the land, there is no color of proof; on the contrary, it is clearly in proof, that land on both sides of the path was shewn to, and viewed by the complainant, as part of the tract. The complainant and defendant Conn, were attended by three of the neighbors. The houses and plantation are on the east and south-east of the path. The complainant viewed the land west of the path, leaving it twice for that purpose, and going towards the western boundary, called, (on the plat returned in this cause,) Springer’s line, and proceeding on the left, or west and north-west, of the path, and near Springer’s line, arrived at the north-west angle of the tract, thence they went to the house and plantation. After this, they went out and viewed the land to the north and east of the plantation, and to the north and east of the path. The complainant’s own examination of the witnesses called to depose by him, as well as the depositions on the part of the defendant, prove that they entered on the land by this path, leading from Montgomery’s, through the body of the land, and passing the south-west and north-west corners of the plantation. They entered at the southern boundary, (called on the plat, Green’s line,) there he was shewn the line, and told they were on the land. They progressed along the path north-westwardly, *220 until they arrived near the south-west angle of the farm; there they turned to the left and viewed the land west of the path, towards Springer’s line; returned to the path, near the north-west angle of the plantation, then turned out of the path again on the west and north-west, and viewed the land, and progressing on that westwardly side of the path, arrived at the north-west angle of the tract, and from thence went south-éastwardly to the house, crossing from the north-west of the path, to the south-east of it. So that he turned out of the path and viewed the land on the rvest and north-west of the path first, and then viewed the house and plantation which is on the east and south-east of the path, and after, viewed the land towards the northern and eastern boundary.
Proofs of particulars as to the qualityami boundaries of the land, not alleged in the bill, and the material variances remarked.
Allegation of suggestions of falsehood will not let in proofs of the suppression of truths.
The complainant has gone into testimony, to shew a concealment, or failure, on the part of the defendant to shew a cypress flat or pond, of about sixty-four acres. This is'shiftinghis case from that which was alleged; to that which is not alleged, from a charge of suggestion of falsehood, to a suppression of the truth. He has likewise gone into proof about a small angle of land at the north-west corner, claimed now by the complainant as shewn, and as extending just beyond the road fretm Shawncctown to Morganlield, amounting to some ten or twenty acres, of no peculiar or better quality or advantage. This is another matter not alleged nor complained of by the bill. Again he has gone into proof to shew that the eastern boundary was shewn at Gill’s path, as crossing it about twenty or thirty poles east of where it turns out to be. This is another mailer not complained of nor alleged in the bill.
Without scanning the proof of the ’complainant, dr the repelling proof of the defendants on these three new subjects — the swamp, the triangle at the north-west corner, and the variance at the crossing of Gill’s path — it is sufficient to say, that it is catching at straws. They were not thought worthy of complaint in the original bill, to which the affidavit of the complainant was annexed, to obtain an in *221 junction, nor in the amended bill, to which there was no affidavit. He has attempted to prove, that which he has not alleged, nor called the defendants to answer.
Allegation without proof or proof without allegation aro nought.
Purchaser cannot complain he was deceived in the quality of the land, where it appears he viewed the tract as far as he chose, but omitted to make a full examination.
Where in a hill for rescission, byla purchaser from one selling as agent, alleging the want of authority, the principal’s answer, admitting the power, and offering to eonvey, is sufficient.
*221 It is a maxim in equity, that allegation without proof, or proof without allegation can never be the foundation of a decree. A decree must be sustained by the allegations, as well as by the proofs; the cases of Carneal vs. Banks, (10 Wheat. 189,) and Cowan vs. Price, (1 Bibb, 173,) will suffice for this.
The burthen of the proof seems to be, that there is more bad land on the tract, than the complainant saw; and it may also be said, there is more good land than he saw. If the complainant has been disappointed in the proportion of poor and rich land, the fault is his own; it was a matter open to examination and to view. That he did not make a more thorough view and survey of the land before he bought, is not the fault of Conn. Although settled on the land, and extending the farm, it is near three years before he complains Of his bargain, in the mean time, lands generally in that quarter had fallen one half in price» This cannot be cause for rescinding the contract. But if the complainant can make out good cause in equity to' rescind the contract, he has a right to have back his purchase money, and avail himself of the fall in prices, by re-investing his money more advantageously. His case should he heard without prejudice from the fall in prices, and the defence of the defendants, should be equally unprejudiced thereby.
The next ground of complaint asserted by the bill, is a want of authority in Conn to make the sale. After the complainant had paid a part of the purchase to Buck hi^nself, after Buck’s answer taken upon commission and filed in the cause, in which he acknowledges Conn’s authority, and his personal ratification of the contract, and his willingness to perform it, it was idle, in the amended bill, to charge a want of authority and ask a rescission of the contract on that ground.
Objections to vendor’s title.
Act of February 10th, 1790, appropriating the lands for the benefit of Seminaries and aceadcinies.
Tile want of title in Buck to the tract of land described in the contract, as that purchased of Taylor, and conveyed by his deed of March, 1818, is the next subject to be considered.
Part of the land so conveyed by Taylor to Buck, is a survey of two hundred and twenty acres, bearing date on the 8th day of May, 1813, lying in the county of Union, granted to “the justices of Union county, for the use of a Seminary,” “by virtue of an act of assembly for the endowment of certain Seminaries of learning, and for other purposes.” The argument is: first, that the grant issued to the justices, was not authorized by law. Secondly, that if the grant to the justices rvas valid, yet the deed of the trustees of the Union academy, did not pass the title to their grantees, Wilkinson, Jones and ToAvles, for want of a deed from the justices to the trustees. These questions depend upon the statutes, made from time to time, authorizing the appropriations of land, for the uses of Seminaries of leárn-
The first act is entitled, “An act for the endowment of certain Seminaries of learning, and for other purposes;” approved February 10th, 1798. (2 Litt. Ed. laws, vol. 2, chap. lx. p. 107.) By this act, six thousand acres of land are given to each of certain academies therein named. The trustees of the said academies are therein authorized and empowered, by themselves or agents, within ten months from the passage of the act, to cause to be surveyed, the quantity of land allowed to the academies respectively, “on any vacant and unappropriated land within this State, on the south side of Green river, each quantity, to be laid off 'in. not more than twelve suryeys, and no survey to be more than twice as long as wide; and shall, moreover, cause a plat and certificate of cfech survey to be returned to the surveyor’s office of the county in which such survey may be, to be recorded, and the same shall be returned to the Register’s office of this State, and the Register, without any fee or reward, shall issue grants as in other cases. And the lands so patented, shall be vested in the trustees of each *223 academy respectively, and their successors forever; and the lands shall be free from taxes, so long as they shall remain the property of the said Seminaries.”
Act of De^88’ andemlow? ing with land CCTtajn °.ttl<'r
By the third section, six thousand acres are given to trustees, for the use of certain other constituted Seminaries of learning, to. be surveyed, patented and vested in the .trustees of the Seminaries respectively and their successors, “in the manner directed in the cases of the other academies in this act mentioned, and the trustees and their successors forever, ,shall be vested with similar powers over the same.”
By the 5th section it is declared “lawful for the trustees of either of the said academies or seminaries, to sell one third of the lands hereby granted to the said academies or seminaries, and no more, without the future consent of the legislature, for the purpose of erecting their public buildings, purchasing a library, and philosophical apparatus.”
By the sixth section, (with a preamble worthy to be held up in letters of sun shine, to be read by the whole human family,) all the lands within the Commonwealth, south of the Cumberland river, and below 0bey’s river, then vacant and unappropriated, were reserved, to be appropriated, from time to time, by the legislature, to the use of seminaries of learning throughout the different parts of the Commonwealth, and all future appropriations for private purposes, were prohibited withjn the reserved boundary.
The next is entitled, “an act to establish and endow certain academies;” approved 22d December, 1798. (Littell’slaws, vol. 2 chap. 172, p. 240.) By this act various academies are established, the trustees appointed and incorporated, with power, to have a common seal, nil vacancies m the board oí trustees; and are severally invested with all the powers and privileges that are enjoyed by the trustees of any academy or college within this Commonwealth, not herein otherwise limited and directed.”
By the second section there is granted to the said “trustees and their successors, for the use of the said academies, six thousand acres each, of vacant lands, *224 to be located on the south side of Green river, including those on the south side of Cumberland, reserved by an act of the last session, for seminaries, upon the same terms and conditions as lands were granted to other seminaries in' this State, by an act of the last session of the General Assembly, entitled, can act for the endowment of certain seminaries of learning, and for other purposes.” This section declares, “the lands hereby intended to be granted to the said several academies, nor any part of them, shall ever be sold or alienated by the said trustees or their successors, nor shall they ever be leased for a longer period, at one time, than twenty-one years.”
County court authorized to have land surveyed and carried into grant for the use of schools.
Act of December 20, 1800.
The third section enacts, “that the several county courts for the several counties within this Commonwealth, in which seminaries have not been established by this or any former act, shall be and arc hereby authorized to have located, surveyed and patented, within the bounds herein before prescribed, six thousand acres of any waste and unappropriated land, for the use of such schools, as may hereafter be established within either of the said counties, under the like rules and regulations as trustees are by this act governed; provided that the several grants and appropriations herein made, shall be subject to the future order of the legislature,” &c.
The next, entitled, “an act to amend the act entitled, an act for the endowment of certain seminaries of learning, and for other purposes,” approved December 20th, 1800, (2 Litt. laws, chap. 310, p. 419,) declares that “the trustees of the respective academies or seminaries of learning now established, or which may hereafter be established, under the act entitled, ‘an act for the endowment of certain seminaries of learning, and for other purposes,’ as also the trustees of such other academies as have heretofore been established by any former law of this Commonwealth, shall be, and they are hereby authorized to sell or otherwise dispose of any part of said lands, not exceeding one eighth part of the quantity granted by the above recited acts, for the purpose of locating and surveying the same, or to reimburse those who have heretofore expended any *225 money or property in locating or surveying said lands.”
The act of 27th Januar ry, 1808, establishing sepainaries iij each cpunty,
The second section authorizes the trustees to sell or otherwise dispose of one other eighth part of the remainder of those lands, and to apply the proceeds to such other purposes as they may deem most beneficial for the support and carrying into effect the said institutions.
By the third section it is enacted, “that the several county courts who may have, or shall hereafter locate lands agreeably to the before recited act, shall be entitled to the same privileges and be authorized to dispose of the same proportion of their iands as the trustees of the several academies are by this act.”
The fourth section gives the farther time of two years to “the trustees aforesaid, to locate and return the plats and certificates of surveys, made on .such locations, to the Register’s office, for all lands granted to the said academies by the before recited acts.”
The act of 27th January, 1808, entitled “an act to amend an act entitled, £an act to establish and endow certain academies,” (3 Litt. laws, chap. 432, p. 440,) declares that a seminary of learning shall be, and is hereby established within each county within this Commonwealth, except those counties in which seminaries are now established by law.”
The second section declares that the several county courts “for the respective counties, in which ser minaries have not been established as aforesaid, shall be, and they are hereby authorized to haye located, surveyed and patented, withm the boundaries heretofore prescribed by law, or within the county where such seminary may be established by this act, six hundred acres of waste and unappropriated land, for the use of the seminary of their said county.”
The third section authorizes the county courts aforesaid, to appoint seven trustees for the seminar ries of their counties, who shall fill the vacancies which may happen by death, resignation or otherr wise; “and the said trustees shall be, and ar,e herer by invested with all the powers and privileges that, *226 are enjoyed by the trustees of any academy or college within this State, and by a concurrence of a ■majority of their members, fix on the name and the .permanent seat of their seminary within their respective counties.
-Union county established .
Act of 1812, giving further lime for locating, surveying and having registered the seminary lauds.
The fourth section declares “that where any county court have proceeded to enter or survey, in part, or the whole cpiantity of six thousand acres of waste land, agreeably to the rules and regulations heretofore prescribed for the government of the ■ trustees of seminaries, such entries or surveys shall be deemed as good and as effectual in Jaw, as if such ■ county ¡courts had been specially named by any particular act of Assembly,” with a proviso that no location shall be made on airy lands ceded to the United States by the treaty of Tellico, or any entry or sur» vey upon military warrants.
Sec. 5 enacts, “that the justices of .the county courts of the several counties, shall have power to sell and convey any part of the lands granted to them by this or any former law, not exceeding one half thereof to enable them to clear out their donation-lands; and so soon as the said county courts shall have perfected their titles to the said lands, they shall deliver over .to the trustees, all the title papers which may be in their hands,” .&c. the farther time of two years from .the passage of this act, is allowed “ to the justices, to cause their entries, and surveys to be made and registered, and no longer; but shall not be restricted to any number of surveys.”
By the act, “entitled an act for the division of Henderson county,” approved, January 15th, 1811, (4 Litt. laws, chap.-220, p. 213) the county of Union was made and established..
By the actentitled, “anactauthorizingthelocation of certain seminary lands, and for other purposes;” approved 4th Feb. 1812, the further time of two years for locating, surveying and registering their donation seminary lands is allowed to “the trustees or county courts, of all those counties” who have not completed them: “subject to the rules, restrictions and regulations, heretofore established by the laws in relation to such claims.”
Grantsforthp seminary lands, for Union coni}1y, established January, 1811, properly issued to the justices the county court.
The second section enacts — “that the justices of those counties which have been erected since the passage of the act authorizing each county court in this Commonwealth to locate and survey six thousand- acres for the use of seminaries of learning, shall be entitled to locate and survey the same quantity of vacant and unappropriated lands under the Samé regulations and: restrictions as provided in the said recited act.”
The fourth section enacts — “that no entry or survey, shall lie made, or patent issue for any less quantity of seminary lands, than one hundred acres in. one survey; nor shall any grant be issued to any other person or persons other- than to the trustees.”
Under the expressions of the second section of this last act, “shall be entitled to locate andsurvey;” it is supposed m argument for the appellee, that tlie justices of the county court of Union had no authority to sue out a patent to themselves; that they should have halted after procuring the surveys; and that by the 4th section of this act the patent should have issued to the trustees to be appointed by the county court of Union; that the-patent having issued to the justices of Union, conveys no title and is void. The expressions “shall be entitled to locate and survey,” must be taken in connexion with the previous and subsequent parts of the same sentence. The justices of counties erected since the passage of “the act authorizing each county court to locate and Survey six thousand acres of land, for the use of seminanies Of learning, shall be entitled to locate• and survey the same quantity” — “under the same regulations and restrictions as provided in the said recited act.” The regulations and restrictions provided in the act referred to, must therefore be looked to as composing a part of this second section of the act of 1812. The act thus referred to, is that of the 22d Dec. 1798, the third section of which authorized the county courts for the several counties in which seminaries had not been established by any former law, to have “ located survyeed and patented,” six thousand acres “for the use of such schools as may hereafter be established within their counties, under *228 the like rules and regulations, as trustees are by this act governed.” Those rules and regulations aré presrcibed by the second section of the said act of 1798, and are declared to be$ “the same terms and conditions as lands were granted to other seminaries,” by “an act for the endowment of certain seminaries of learning, and for other purposes,” which is the act of 10th Feb. 1798; This act requires the lands to be surveyed on the south side Of Green river; that a plat and certificate of the survey be recorded in the proper surveyor’s office; that the trustees cause it to be registered, and thereupon “the Register, without fee or reward, shall issue grants as ia other cases. And the lands so patented shall be vested in the trustees of each academy respectively, and their successors;” and shall be free from taxes “so long as they remain the property of the said seminaries.” The “register shall issue grants as in other cases.” How must grants issue in other cases? To the persons in whose names they have been surveyed, unless legally assigned; and if so the grant recites the name of the assignor. None of the acts of the Legislature have authorized or required the county courts to assign the plats and certificates of survey made for them, to the trustees whom they may appoint to conduct the affairs of the seminary. The regulations are that the county courts shall cause the lands to be located and surveyed, duly recorded and returned to the Register’s office; then the Register is to perform his duty by issuing grants thereon as in other cases. The restrictions alluded to in these acts are, as to the length and breadth of the surveys, the minimum quantity of each survey, the time within which they shall be made; — as in the act of 1798, and the subsequent acts giving farther time to complete the titles; and as to the proportions which may be sold, and how to be leased &c.
Acts examined on the question to whom the grants of the seminary Sands were to he issued.
An attentive penisaf of the acts upon this subject, will convince the mind, that the act of 10th February, 1798, is the foundation; the subsequent acts are the parts of the superstructure built upon it; it will be perceived, that all the subsequent acts embrace two descriptions of seminaries of learning: first, such as are organized and existing, and have their *229 own agents and trustees; secondly, such as are not organized and existing but in contemplation; for such the county courts are made agents and trustees, to locate, survey, and receive the grants for the land, and hold them to the use of the seminaries, whose agents and trustees, when appointed, are to dispose of the lands by Sales and leases according to the permissions of the laws. The justices of the county court, causing tó be located and surveyed, the lands conceded to the seminaries within their respective counties, are acting as trustees; in receiving the titles, they do receive it “for the use of such Schools;” this is a trust, and when the patent issues to them it does issue to the trustees. In 1812, the county court of Union were authorized by the passage of that act, to locate and survey, because Union county was established after the former laws were passed, and there was no former law that would permit them to appropriate the six thousand acres. No seminary was then existing in Union; no trustees were appointed nor acting; it remained for the county court to appoint them. The fourth section of the act of 1812, in requiring the grants to issue to the trustees and no others, meant those trustees who were appointed by law, the justices of the court, to survey, locate, and take the titles to the use of the schooi. It cannot apply to trustees of Union academy, not then named, not organized, and whose trustees had not then been appointed.
Authority of provisions of the acts re-spectra^ the gj^tl ° 6
it is seen in the provisions of the former acts that the justices of the county courts, had been authorized to sell or otherwise dispose of certain portions of their lands, (by the act of 27th January, 1808) “not exceeding one half thei’eof, to enable them .to clear out their donation lands.” The prohibition of the 4th section of the act of 1812, means nothing more than to prohibit grants to issue to the vendees or assignees of these seminary claims: so as to hold a check upon the quantity to be granted to each seminary, and a check upon the dispositions to be made, so as that they should not exceed the proportions fixed by law. Trustees in this section is contrasted with the purchasers from or under the trustees. It would be an unreasonable construction of the stat *230 iite to arrest the title, by stopping at locating ami surveying, when no assignment of the plats and certificates from the county courts to the trustees to be appointed by the courts, had been authorized. Every security intended by this statute is preserved by understanding the word “trustees” as used in this section, to mean the justices of the county court, who were by this act and the preceding acts, for the purposes of seeming and receiving the titles to the lands conceded to the several comities for the use of schools, constituted trustees. The patent, therefore, properly issued to “the justices of Union for the use of a seminary;” the patent is not illegal nor inoperative.
Uiiioii aca-* demy established.
Land in question conveyed by the trustees, and a title deduced by tbuvendor, Buck, to himself.
Want of title to 50 acres, part of a tract of 800 and odd acres, not appearing to be important to the purchaser is no ground for a rescission, but for compensation.
*230 The Union academy, was established by ah act of the 19tb January, 1814 — entitled, “an act to establish an academy in the county of Union” — (5 Lift. laws, 149.) This act gives the name, appoints the trustees, with power to fill vacancies, makes them a body corporate, and expressly gives them “power to dispose of all the lands heretofore or hereafter appropriated for the benefit of seminaries in said county according to existing laws.”
The justices of Union held the titles to the use of such seminary of learning as should be established in the county, the act establishing the Union academy gave to the trustees of the Union academy full power and authority to convey; and the conveyance by the trustees was made in pursuance of, and in compliance with a contract made by the justices for procuring the locations and surveys of their lands. The derivation of title by Buck under the deeds made by the trustees to Wilkinson, Towles and Jones, is regular, and requires no comment.
For the' tract of fifty acres, recited in the con-. tract, as so much to be conveyed by Latham to Taylor, under the decree in the suit between them, Buck has produced no title. But this docs not seem to have been any inducement to the purchase made by the complainant, of the other tract of 787 acres; it lias no defined boundaries, so far as appears in this record. The quantity is too small, to be cause for rescinding the contract because of a want of title. *231 it is more equitable that Buck should make compensation for that, than to -rescind the contract. The cases of Findley’s executors vs. Lynch, (2 Bibb, 568,) M’Cown vs. Delaney, (3 Bibb, 48,) Reynolds vs. Vance, (4 Bibb, 215,) and Cates vs. Railey, (1 Mon. 168,) are precedents-on this subject. The bill and .answers are silent as to these fifty acres — -it forms no particular subject - of complaint, nor -have they ¡attracted the attention of either party, in the preparation of their case. Whether they were ever set apart by Latham, or possessed by M’Caughtry, does not appear. But as no title is exhibited, as to these fifty acres, the complainant would, have a right to demand a compensation, by deducting seven dollars per acre, out of the purchase money which is in arrear, to be applied as a credit, so as to stop any interest accrued or accruing on that sum. But upon the bill as framed, and the answers, and proofs, the complainant is entitled to no decree in this cause.
Decree.
llow purchaser shall be relieved for want of title to a small anti an unimportant; part of his purchase.
*231 This cause came on to be heard on the transcript of the record filed, and the arguments of counsel, on consideration whereof, this court is of opinion, that there is error in the decree of said circuit court, in this, that the said circuit court determined, that the said contract in the bill mentioned, should be rescinded, and that the said defendants should, pay the complainant for improvements^ made upon the land by him, and refund the part of the purchase money which had been received; whereas this court is of opinion, that the complainant has shown no cause for rescinding the said contract, nor for having a decree for the value of the improvements, nor for having a repayment of any portion of the purchase which had been paid: and this court is farther of opinion, that as to the fifty acres in the contract described, as having been decreed to be conveyed by James Latham, to Jonathan Taylpr, and sold to the complainant by the defendants, they would furnish no cause for rescinding the contract, in case it .should turn out that the defendants could not convey, for want of a title, when in equity the complainant shall have a right to a conveyance; but that in case of such inability to convey, the said fifty ?crcs, that the complainant would be entitled to *232 have therefor, a deduction out of the purchase money, at the contract price: and this court is farther of opinion that as it appears that the complainant hath not paid, nor tendered payment of the purchase money, according to contract, but that a large portion thereof, is yet in arrear, and unpaid, far exceeding any deduction which might he claimed, in case the said fifty acres cannot be conveyed as aforesaid, and forasmuch as the bills and answers are silent as to the said fifty acres, and they do not appear to have been any specific cause of complaint or controversy in this cause, and forasmuch as the defendant Buck has, in equity, a lien on the land foi the payment of the purchase money, as well as by the express terms of the contract; that the complainant on his bill and complaint, and proofs, as made, hath shown as yet, no right to ask of a court of equity a decree for a conveyance of the title to the lands purchased by him of the defendants; therefore it is farther ordered and decreed that the said decree of the circuit court be reversed, set aside and annulled, and that the cause be remanded to the said circuit court with directions to dismiss the bill with costs.
Crittenden, for appellants; Mayes, fpr appellee.
And it is further decreed and ordered that the appellee pay to the appellants, their costs in this behalf expended,